Filed 8/26/20  Marriage of D'Souza CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of DINESH and DIXIE D'SOUZA. | |
| | D072564 |
| DINESH D'SOUZA, | |
| Appellant, | (Super. Ct. No. DN171984) |
| v. | |
| DIXIE D'SOUZA, | |
| Appellant. | |

APPEAL from judgments of the Superior Court of San Diego County, Thomas Ashworth, III, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Law Offices of Stephen Temko and Stephen Temko for Appellant Dixie D'Souza.

Procopio, Cory, Hargreaves & Savitch, Kendra J. Hall, Lionel P. Hernholm, Jr., and David M. Zachry for Appellant Dinesh D'Souza.

Dinesh and Dixie D'Souza were married for over 20 years, during which time they accumulated a substantial marital estate.  In this dissolution

proceeding, Dixie appeals from judgments entered on reserved issues, including division of property, spousal support, and sanctions.[1] On these issues, she contends the trial court made numerous and varied errors. The issues were decided by an agreed upon privately compensated temporary judge and then incorporated in judgments signed by the family court. Litigation spanned five years and proceeded in three phases, with Dixie represented by counsel throughout (by at least seven different law firms). For reasons we explain, we conclude there is no reversible error and affirm the judgments.

FACTUAL AND PROCEDURAL BACKGROUND

Dixie and Dinesh married in May 1992 and began primarily living apart in August 2010. Each began romantic affairs with other people between 2010 and 2012. In October 2012, or over 20 years after they married, Dinesh filed for divorce. October 2012 was later adjudicated as their legal date of separation.

The couple had one daughter (Daughter) during marriage, who was 16 years old in 2012 and an adult attending college when judgment was entered.

Dixie and Dinesh are both college graduates. Dinesh attended Dartmouth College, and prior to marriage, was a published New York Times best-selling author. He continued to publish books during marriage and after the couple separated. A few of the books became films. Dinesh's works typically had a conservative political or religious theme. During the marriage, he gained notoriety and media attention for his works and

---

[1] Dinesh filed a protective cross-appeal and asserts no independent claim of error. We refer to the parties by their first names for sake of clarity. (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1474, fn. 1.)

generated income primarily as an author, lecturer, and film producer. His income from 2007 through 2012 averaged about $75,000 per month.

For her part, Dixie stopped working prior to marriage and was a homemaker and primary caretaker for Daughter.

During their marriage, the couple acquired and lived in a 7,300 square foot home in the gated, affluent community of Fairbanks Ranch in Rancho Santa Fe. Preseparation, they completely paid off the mortgage. Depending on the appraiser, the home was worth about $3.2 or $3.7 million in 2015. The home's furnishings, comprised of at least 139 collections of items, were valued at approximately $193,850.[2]

Historically, Dinesh handled the couple's finances, investments, and bills. The D'Souzas had numerous bank and investment accounts. Dinesh did not habitually consult with Dixie prior to making an investment or financial decision. According to him, Dixie was not "remotely interested" in their investments and was simply happy to know that they were "making money." Their discussions about finances were typically limited to her asking him whether they could afford to purchase something, to which he would respond. Dixie admitted she did not know details of the couple's investments because she "didn't understand a lot of these financial things."

Beginning in the 1990s, Dinesh maintained bank accounts in India (in the currency of rupees) for the family's expenditures when they traveled to India. He gradually increased the amounts in these accounts over time because they generated higher interest rates than the couple's other bank accounts. In 2011, Dinesh transferred money (community property) into the

---

[2]    As the appraiser explained in her report, numerous items were valued in collections or as a complete set rather than individually, e.g., a collection of tapestries or a pair of vases.

Indian bank accounts to purchase a one-half or one-third interest in five properties located in India—three in Goa and two in Mumbai—because he thought it would be a good investment. The properties in fact maintained or appreciated in value. Dinesh did not concurrently tell Dixie about the investment but made full disclosure by April 2012 when she questioned him about it. According to Dinesh's appraiser, the properties collectively had an estimated fair market value of $1.2 million (100 percent interest) in October 2015.

In 2012, Dixie invested $38,000 of the couple's cash (two withdrawals of $15,000 from their joint bank account and $8,000 accumulated in her desk drawer) in a company called Players Road, LLC. Dinesh did not consent to this investment. It was a total loss.

In October 2012, Dinesh filed a petition for dissolution in San Diego Superior Court. The ensuing litigation was protracted and bitter, with Dixie utilizing at least seven different law firms from beginning to end and incurring over $2.5 million in attorney fees and costs. Dinesh incurred approximately $1.4 million in attorney fees and costs. The parties agreed early on to have their case decided by a privately compensated temporary judge, Honorable Thomas Ashworth, III (ret.).[3] The parties further agreed the case would proceed in three phases: (1) a trial on the issues of temporary spousal support and date of separation, which concluded in a final statement of decision in January 2015; (2) a trial on reserved issues including permanent spousal support and property division, which concluded in a 21-

---

[3] California Rules of Court, rule 2.831, allows parties to request a privately compensated temporary judge if their stipulation to that effect is approved by the court's presiding judge.

page, final statement of decision in September 2016;[4] and (3) a document trial on attorney fees, costs, and sanctions, which concluded in an 11-page final statement of decision in December 2016. The latter two final statements of decision[5] were incorporated in 2017 judgments, which are the subject of this appeal.

After the first, seven-day trial in 2014, the court (Judge Ashworth) found the parties' legal date of separation was October 3, 2012, or the date Dinesh filed his petition for dissolution, even though the court acknowledged that evidence could have supported an earlier date of separation. Further, the court ordered temporary spousal support to Dixie in the amount of $25,000 per month, reduced from a prior, interim support order of $50,000 per month. The rulings from the first trial are unchallenged on appeal but provide context to the court's later, challenged decisions.

After the second, seven-day trial in 2016, the court found the appropriate amount of permanent spousal support to Dixie was $35,000 per month, considering all the factors under Family Code section 4320.[6] The court then engaged in dividing the couple's substantial estate, including determining Dinesh's and Dixie's separate property as opposed to community

---

[4]    The final statement of decision on reserved issues was corrected by a 2-page order dated October 2016.

[5]    In each instance, the court first issued tentative statements of decision, to which the parties had an opportunity to object.

[6]    As a consequence of its finding on permanent spousal support, the court determined that Dinesh overpaid spousal support for the months between April 2013 and October 2014, when he was paying Dixie $50,000 per month. The court's final statement of decision therefore charged Dixie for this overpayment.

property. In this regard, the final statement of decision categorically discussed numerous assets and liabilities. Notably, the court awarded Dixie the couple's largest single asset, the unencumbered Rancho Santa Fe home, as well as the home furnishings, and declined to impose a *Watts*[7] charge of nearly $250,000 on her, representing her share of the fair rental value of the home.

The court accepted Dinesh's evidence on the value of the community's five properties in India, noting that his team of appraisers was "well qualified and believable" and provided the "only reliable values" of the foreign properties. In contrast, Dixie was "given every opportunity to obtain her own appraisals and failed to do so."

The court made a number of findings relating to other investments, claims for reimbursement, and claims of breach of fiduciary duty.

Finally, in the third phase of the case, the court rendered its decision on the parties' requests for attorney fees, costs, and sanctions, after thoroughly reviewing their postseparation behavior and litigation conduct. The court discussed the complications and problems the case had encountered, over which Judge Ashworth presided for four years. Ultimately, with certain specified exceptions, the court denied each side's request for additional sanctions based on claimed nondisclosures of information, finding that "neither party's . . . conduct was exemplary but is deemed understandable and offsetting considering all of the above circumstances."

---

7  *In re Marriage of Watts* (1985) 171 Cal.App.3d 366 (*Watts*). *Watts* authorizes reimbursement to the community for one spouse's exclusive use of a community property asset between the date of separation and the date of trial. (*Id*. at p. 373-374.) Dixie exclusively used the couple's Rancho Santa Fe home after October 2012.

This appeal followed.  We discuss each issue below in the order presented by Dixie, providing further background as needed.

DISCUSSION

I.    *Standards of Review*

It is undisputed many of the disputed trial court rulings in this case are reviewed under a deferential standard.  (E.g., *In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1443 ["As a general rule, we review spousal support orders under the deferential abuse of discretion standard"]; *In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1225 (*Corona*) [reviewing Family Code sanctions order for abuse of discretion].)  We review the court's factual findings for substantial evidence.  (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734 (*Rossin*) ["factual findings that underpin the characterization [of property] determination are reviewed for substantial evidence"]; *In re Marriage of Duffy* (2001) 91 Cal.App.4th 923, 931 [breach of fiduciary duty finding reviewed for substantial evidence].)  De novo review is appropriate when the resolution of an issue turns on a critical legal consideration.  (*Rossin*, at p. 734.)

II.   *No Reversible Error in Admitting the Appraisal Expert's Testimony*

Dixie's first claim of error is the trial court abused its discretion in admitting the expert testimony of Evan Ranes, an appraiser, over her hearsay objection.  Ranes opined at trial on the value of the couple's five Indian properties.  Dinesh responds that Dixie did not actually object to Ranes's testimony and thus, forfeited the claim; there was no error because Ranes's testimony was admissible; and Dixie has failed to establish prejudice from the claimed error.  We provide further background and analysis below.

7

A.    *Further Background*

Prior to the 2016 trial, Dinesh disclosed he had retained the Landauer Valuation & Advisory firm (Landauer) to determine the fair market value of the Indian properties, and he provided a copy of Landauer's appraisal report to Dixie.  The October 2015 report was authored by Ranes, who worked in Landauer's North American offices.  Landauer is a division of a parent entity, which parent entity also employs appraisers in Mumbai, India.  In his report, Ranes explained his appraisal methodology (sales comparison approach), indicated his reliance on the Landauer-affiliated Indian team to provide him with information (such as comparable sales and visual inspection of the properties), and estimated the fair market value for each property, collectively totaling about $1.2 million.

At trial, Ranes explained his expert qualifications and the manner in which he directed the team of Indian appraisers, which conducts appraisals under different standards.  Ranes was questioned on the issue as follows:

> "Q.  You mentioned USPAP standards.  And you also mentioned standards identified as . . . RIC.  And again, what does . . . RIC stand for?
>
> "A.  RIC stands for Royal Institution of Chartered Surveyors, which are the standards normally used in Europe and Asia.  The standards we normally use here [in the U.S.A.] is USPAP, Uniform Standards of Professional Appraisal Practice.
>
> "In looking at the standards and in talking to Robert Mayer, the head of [Landauer's litigation support] team, we determined that [the standards are] virtually the same and it would be acceptable.
>
> "[Dixie's counsel]:  Let me bring up an *objection issue* now, because we're going to get to it sooner or later.  A lot of this testimony is going to rely upon hearsay and I don't

know the [c]ourt's attitude toward that and we're going to be into what I believe will be compound hearsay before we get through this.

"To the extent the witness is going to testify about what Mr. Mayer told him or didn't tell him or what the team in India told him or didn't tell him, it's obviously hearsay.

"THE COURT: My position is that experts in this category can rely on hearsay and can testify from that.

"[Dixie's counsel]: For all purposes?

"THE COURT: Yes. I mean, there may be some exceptions, but this would not be one of them to me." (Italics added.)

A few moments later, Dixie's counsel made a few additional comments, appearing to agree with the trial court's view of the law:

"[Dixie's counsel]: I quite well understand. I just wanted to know as we're going to have at least two additional appraisers above and beyond this during this trial, I don't want to be here doing hearsay objections and narrative objections and interfering with the flow of the testimony unnecessarily. *So I'd just as soon get it all in, to tell you the truth.*

"THE COURT: And that's my theory. We have to do the best we can practically here. I think that experts are *allowed generally* to rely on hearsay and if it's the best we can do, it's the best we can do.

"And I know that you probably get tired of hearing this, but some things go to the weight to some extent as to how reliable I think they are. But it's obviously not easy for a [c]ourt here in California to deal with property located in the country of India. And we have different appraisal standards and all other sorts of problems.

"[Dixie's counsel]: *Quite so*, Your Honor. *I was only raising a point of clarification* so that we could eliminate those type of banal inquiries on my part or objections.

"THE COURT: And I appreciate that. Anyway, that is my position on expert testimony." (Italics added.)

Dixie's counsel did not object to any specific portion of Ranes's testimony on hearsay grounds, and counsel expressly stated that he had "no" objection to the court's admitting Landauer's written appraisal report in evidence (exhibit 43, signed by Ranes). The written appraisal report comprehensively contained Ranes's opinion of value and all underlying data to support his opinion.

Based on his personal experience and knowledge, Ranes also testified that appraisers often rely on input from third parties in performing an appraisal:

"Q. Now, when you do your work, do you typically rely from time to time on the input of third parties in order to garner the information you need to present an appraisal?

"A. In the course of our work, when we take an assignment, we often rely on third-party reports. Part of our job is to confirm data from brokers on either side of a sale, property—or market participants, such as a seller or buyer, so we're confirming data with them, asking them questions, deciphering what they say, interpreting what they say.

"We look at title reports. We look at property inspection reports. These are done by other people. Oftentimes we get Phase 1, Phase 2 environmental site assessment studies to review . . . just to name a few of the things that we review in the course of our business.

10

"Q. And those are the types of material or information that you yourself are not capable of obtaining through your own work and effort; is that right?

"A. No, I wouldn't be qualified to do all of it. And if I was, I would get one report done a year or maybe two."

Ranes explained why he felt comfortable relying and signing off on the work done by the Indian team. He testified about the properties—most residential and one commercial—and why he believed comparable sales supported his opinion of value. Despite having ample opportunity to do so, Dixie did not present her own appraisal expert on the value of the Indian properties.

B.    *Analysis*

1.    *Forfeiture*

The rules regarding forfeiture are well established. The admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court; specificity is required both to enable the court to make an informed ruling on the objection and to enable the proffering party to cure the defect in the evidence. (*People v. Nelson* (2012) 209 Cal.App.4th 698, 711.) Further, " 'it is settled law that where evidence is in part admissible, and in part inadmissible, "the objectionable portion cannot be reached by a general objection to the entire [evidence], but the inadmissible portion must be specified." [Citations.]' " (*People v. Burroughs* (2016) 6 Cal.App.5th 378, 408-409.) A mere suggestion by counsel that a question is improper does not suffice to preserve the issue for review. (*Morgan v. Myers* (1911) 159 Cal. 187, 192.)

Applying the foregoing rules, Dixie's claim of error is forfeited. At the time Dixie's counsel raised an "objection issue," Ranes had not yet provided his opinion of fair market value or any data underlying his valuation. He had primarily provided general background information about appraisal

11

standards, which is permissible. Under the circumstances, raising a general question about potential hearsay unconnected to specified testimony did not allow the trial court to make an informed ruling or produce a proper record for our review. There was no objection to Landauer's appraisal report, which contains the same value of opinion to which Ranes orally testified. It is not clear to us what portion of the appraisal report is objectionable on hearsay grounds. The report is signed solely by Ranes. Further, after hearing the court's general views on the matter, Dixie's counsel arguably waived the issue by stating, "I'd just as soon get it all in, to tell you the truth." Thus, the issue has not been adequately preserved for our review.

2.     *Admissibility of expert opinion*

Even assuming the hearsay issue is properly before us, we would conclude the trial court did not err in admitting Ranes's testimony. To support her position that the expert's testimony contained inadmissible hearsay, Dixie relies on *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). *Sanchez* held, in a criminal gang case, that a gang expert may not relate "case-specific facts" without satisfying hearsay rules. Case-specific facts are "those relating to the particular events and participants alleged to have been involved in the case being tried" (*id.* at p. 676), e.g., prior police contacts with the defendant standing alongside known gang members (*id*. at p. 694). At most, a gang expert may be asked to assume a hypothetical set of case-specific facts, which are established through independently admissible evidence, and asked to offer an opinion based on the assumed facts. (*Id.* at pp. 676-677.)

Nonetheless, an expert "may still rely on hearsay in forming an opinion . . . and may tell the [fact finder] in general terms that he did so." (*Sanchez, supra*, 63 Cal.4th at p. 685, italics omitted.) In valuations of real property,

12

the Evidence Code prescribes specified rules and allows qualified expert witnesses to base their opinions on hearsay statements, like evidence of comparable sales. (E.g., Evid. Code, §§ 810, 816 ["a witness may take into account as a basis for his opinion the price and other terms and circumstances of any sale or contract to sell and purchase comparable property"]; *Merced Irrigation District v. Woolstenhulme* (1971) 4 Cal.3d 478, 502-503 [admissibility of testimony relating to comparable sales is sanctioned by Evidence Code and rests largely in the discretion of the trial court].) Furthermore, a qualified expert may base his or her opinion of property value on "matter . . . whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion as to the value of property. . . ." (Evid. Code, § 814.)

We are persuaded that Ranes permissibly testified to his opinion of the value of the Indian properties and the bases for his opinion. Even if Ranes related out-of-court statements by Indian appraisers, undisputed record evidence indicates that appraisers routinely rely on the statements and reports of third parties for information outside of their personal knowledge, such as reports on the property's condition, consistent with Evidence Code section 814. Ranes testified that he thoroughly vetted the Indian appraisal team and found their appraisal standards to be commensurate with his own. It stands to reason that an American appraiser may have to rely to some extent on the work of foreign nationals when valuing foreign property. Ranes's valuation was supported by independently admissible comparable sales data, which is a generally accepted basis for appraisals of real property. Dixie has not established trial court error in admitting Ranes's opinion testimony.

13

3. *Harmless Error*

Assuming the trial court erred in admitting some portion of Ranes's testimony, Dixie has failed to show prejudice. "The burden is on the appellant in every case to show that the claimed error is prejudicial; i.e., that it has resulted in a miscarriage of justice." (*Cucinella v. Weston Biscuit Co.* (1954) 42 Cal.2d 71, 82.) Prejudice is not presumed and must appear affirmatively upon an examination of the entire record. "[T]he appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106; see also *Santina v. General Petroleum Corp.* (1940) 41 Cal.App.2d 74, 76.)

The court accepted Ranes's valuation of the five Indian properties in arriving at the community's interest of about $525,000. Dixie claims the court's error in admitting Ranes's testimony was prejudicial because there was "no other admitted evidence concerning the value of the properties." However, Dixie cannot complain of any lack of valuation evidence because she clearly had the opportunity to provide an alternative expert valuation but failed to do so. Under these circumstances, we cannot reasonably presume the Indian properties were worth *more* than what Ranes testified to. (Cf. *In re Marriage of Hargrave* (1985) 163 Cal.App.3d 346, 353 [referee arbitrarily assigned a value of $35,000 to goodwill, an amount that did not coincide with either husband *or* wife's experts, who valued goodwill at $0 and $100,000, respectively].) We discern no miscarriage of justice.

III. *No Reversible Error in Disposition of Home Furnishings*

In February 2016, as trial was underway, Dixie indicated she would like to be awarded the Rancho Santa Fe home in the court's final division of property, to which Dinesh agreed. Before the court, Dixie's counsel also

14

described a plan of disposing of the home furnishings, stating that they would be "sold subject to either [Dinesh] or [Dixie] picking any particular item they would want. If they do pick such an item, it would be charged to that receiving party based on the schedule of values established by [Dinesh's] appraiser. . . ."

The court asked a few questions about how, mechanically, each side would pick an item, who would go first, and at what point would everything else be sold, to which Dinesh's counsel responded, "[it] could be picking one [item] and then allowing someone else to make as many picks as they want and then saying I'm done, and then we add it up. It may not go back and forth to conclusion. I really don't know. You don't have to pick if somebody else picks. That's what I'm getting at." Dixie agreed to the appraised values by Dinesh's expert. The court stated that the parties' "stipulation is accepted and will be part of the judgment."

In the court's statement of decision, issued several months later, the court awarded the Rancho Santa Fe home to Dixie per the parties' agreement. The court further awarded all the home furnishings to her at the total appraised value of $193,850, indicating it was sensible under the circumstances.

Dixie argues on appeal that the court erred in awarding the home furnishings to her, thus effectively rejecting the parties' stipulated sales plan. Generally, we review a ruling dividing property for abuse of discretion. (*In re Marriage of Dellaria & Blickman-Dellaria* (2009) 172 Cal.App.4th 196, 201 (*Dellaria*) [involving a couple's stipulated division of community property].) By default, under the Family Code, the trial court equally divides the community estate. The parties may agree to an alternative arrangement by

15

entering into a written agreement or an oral stipulation in open court. (Fam. Code, § 2550; *Dellaria*, at p. 201.)

Here, Dixie has not established an abuse of the court's discretion or any prejudice from the decision awarding her the home furnishings. We are not convinced the parties' "stipulation" pertaining to the disposal of home furnishings contained sufficiently definite terms to be enforced by the court without further litigation. (*Dellaria, supra*, 172 Cal.App.4th at pp. 203-204 [settlement agreement must be of sufficiently definite terms to prevent the court from "enforcing an agreement that never was made"].) The plan was subject to contingencies and unknowns that could render it unworkable and lead to the need for further court intervention. The home furnishings consisted of hundreds of individual items. Additionally, injury "is not presumed from error[; it] must appear affirmatively upon the court's examination of the entire record." (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337.) The court's ruling enabled Dixie to dispose of the furnishings however she wished. She agreed to the appraised values at trial, and there is nothing in the record to suggest that the items possessed a lesser value. The court did not reversibly err in awarding the home furnishings to Dixie.

IV. *No Reversible Error in Finding that the Principal Amount Invested in a Film Company Belonged to Daughter*

Dixie contends the court erred by not restoring the community with at least $100,000 that Dinesh withdrew from Daughter's investment account and used to invest in a film company. As discussed below, we conclude the court did not err.

A. *Further Background*

At trial, Dinesh testified to the following facts: After consulting with their tax lawyer, Dinesh and Dixie agreed from the time of Daughter's birth

16

to give her a tax-free gift per year of $15,000. The couple also agreed during marriage that they would save and give Daughter money to pay for her college education. By 2012, Daughter's investment account, which included gifts of money from her parents, had accumulated around $300,000. In May 2012 (preseparation), Dinesh transferred an additional $100,000 into Daughter's account. He testified that this amount was to help Daughter, who was still a minor at the time, cover her future college costs because he perceived a shortfall in her accounts after attending a seminar on the matter.[8]

Rancho Esperanza was the company producing one of Dinesh's films. In July 2012, after an investor dropped out at the "very last minute," Dinesh informed Daughter of the opportunity and used $150,000 from her investment account to purchase a 6.25 percent interest in Rancho Esperanza. The following year, Daughter received back $273,390 from the investment, or a profit of $123,390.

In its final statement of decision, the court "confirmed" Daughter's ownership of her investment account and charged neither Dinesh nor Dixie with the balance. However, the court found that Dinesh did not disclose the Rancho Esperanza investment to Dixie and that this was a breach of fiduciary duty. As a penalty, the court charged Dinesh with the profit of $123,390, representing the profit the community could have earned.

---

[8] Dixie testified that she and Dinesh had discussed and agreed to (a) save money for Daughter's college expenses in a "college account," and (b) give Daughter annual tax-fee transfers of money, which were eventually deposited in the investment account. Dixie admitted she participated in opening Daughter's college account and she was aware of Dinesh opening Daughter's investment account during their marriage, but Dixie claimed to not have access to statements for the investment account.

B. *Analysis*

On appeal, Dixie asserts that $100,000 of the "initial investment" by Dinesh in Rancho Esperanza using money from Daughter's investment account should have been returned to the community. We disagree.

The trial court found that the entire balance of Daughter's investment account belonged to Daughter, or by implication, that all preseparation amounts transferred to her account were gifts from her parents. We review this factual finding for substantial evidence. (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 102 (*Ciprari*). Here, substantial evidence supports that Dinesh and Dixie agreed early in their marriage to fund Daughter's accounts with enough money to cover her future college expenses, as a gift. Prior to 2012, Daughter's investment account had already accumulated a substantial balance, which Dixie apparently concedes was a community gift to Daughter. Dinesh testified that the $100,000 given to Daughter in May 2012 was an additional contribution to her college funds. We have no basis to reverse the court's implied finding.[9]

Separately, the court found a breach of fiduciary duty by Dinesh's failure to disclose and offer the Rancho Esperanza investment opportunity to

_____

[9]     Dixie argues for the first time in her reply brief that the $100,000 transfer of money to Daughter's account cannot be considered a "gift" because Dinesh never obtained Dixie's "written consent" to make the gift. (Fam. Code, § 1100, subd. (b).) This "written consent" argument is forfeited as it was not previously raised, either in Dixie's closing trial brief or in her objections to the tentative statement of decision. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 826.) In any event, we find the argument unpersuasive. The written consent requirement is inapplicable when gifts are "mutually given by both spouses." (Fam. Code, § 1100, subd. (b).) Here, on this record, the court could reasonably find that Dinesh's 2012 transfer of $100,000 to Daughter's investment account was "merely executing on a mutually agreed . . . plan" of funding her college education. (*Ciprari*, *supra*, 32 Cal.App.5th at p. 103.)

the community.  The Family Code recognizes that spouses share a fiduciary relationship, which imposes on each spouse a "duty of the highest good faith and fair dealing" toward the other.  (Fam. Code, § 721; *In re Schleich* (2017) 8 Cal.App.5th 267, 277.)

Based on Dinesh's failure to disclose the investment opportunity, the court permissibly charged Dinesh with the full amount of the investment profit the community could have earned.  (See Fam. Code, § 1101, subd. (h) [remedies for malicious breach of fiduciary duty by one spouse includes an award to the other spouse of 100 percent of any asset undisclosed or transferred in breach of the fiduciary duty].)  The court was not required to additionally charge Dinesh with funds contributed to Daughter's investment account, which were set aside for her college education.  Dixie has not established reversible error.

V.    *No Reversible Error in Rejecting Dixie's Reimbursement Claim Relating to Dinesh's Girlfriend*

Dixie contends the court erred in not reimbursing the community for funds spent by Dinesh on his girlfriend (Girlfriend), e.g., for a ring.  Dixie bases her reimbursement claim on a schedule prepared by her accounting expert, David Blumenthal.  We provide further background below and conclude the court did not reversibly err.

A.    *Further Background*

By 2010, Dinesh began primarily living in New York in connection with his employment as the president of The King's College, a private college located in New York City.  Dinesh maintained a furnished apartment in New York, of which Dixie was aware, and he periodically flew back and forth between coasts.  By 2011, unknown to Dinesh, Dixie was having an affair

19

with another man (Boyfriend). In the summer of 2011, Dixie took trips to France to be with Boyfriend.[10]

In 2012, Dinesh met Girlfriend and began a relationship with her. She lived with him for some time in New York. The relationship continued into 2013.

Both Dinesh and Dixie admitted during the 2016 trial that they had spent some community funds in pursuit of their respective affairs. Dinesh testified to purchasing an engagement ring for Girlfriend during the preseparation period for "around $50,000." He testified he bought Girlfriend "a couple other things" during their relationship, continuing through 2013, of "much lesser value."

Dixie testified she had incurred expenses in "pursuit" of her relationship with Boyfriend, particularly in the form of flights. According to Dinesh and evidenced by several contemporaneous emails, Dixie incurred particularly large expenses in the summer of 2011 while she was in France with Boyfriend, in the range of tens of thousands of dollars. For example, in about one month of that summer, she incurred $20,000 in expenses, withdrew $5,000 in cash, and purchased a $2,700 piece of jewelry.

Late in the trial, Dixie's expert Blumenthal presented a "misappropriations" schedule related to preseparation amounts allegedly spent by Dinesh on Girlfriend, totaling $158,917. Blumenthal had no personal knowledge that any of the nearly 30 listed items were spent on Girlfriend. For the largest single item, "engagement ring," the schedule noted an estimated value of $100,000, "per Dixie." For the other line items,

---

[10] In adjudicating the couple's date of separation, the trial court found that Dixie was having "what can only be described as a torrid affair" for over a year with Boyfriend, who was a traveling entertainer. Dixie accompanied Boyfriend "on 20 different trips," both domestic and international.

Blumenthal had taken amounts off the couple's bank or credit card statements and listed them on the schedule based primarily on Dixie's representation that the amount should be attributed to Girlfriend. These amounts appeared to relate to flights to and from New York, a New York apartment, and furnishings.[11] Separate from the engagement ring, Blumenthal's schedule listed a line item of nearly $15,000, entitled "Michael C. Fina" and dated September 2012, as "jewelry for [Girlfriend]." At trial, however, Dinesh testified that "Michael C. Fina" was where he purchased the engagement ring for Girlfriend. Dinesh did not testify to the dates or location of where he purchased any other jewelry for Girlfriend.

The court denied Dixie's reimbursement claims on the bases that they were untimely raised "after the trial started so that the parties' accountants had no chance to reconcile them" and lacked "credible evidentiary support." As to Dinesh's miscellaneous furnishings, the court found that their value was de minimus in consideration of the estate's size and denied reimbursement accordingly.

B.    *Analysis*

Generally, spouses "during the existence of the marriage may set aside a gift of community property by [one spouse] to a third party without [the other spouse's] consent." (*Babbitt v. Babbitt* (1955) 44 Cal.2d 289, 293.) A spouse may claim reimbursement for the other spouse's nonconsensual acts of appropriating community property for his or her own benefit. (*In re Marriage of Frick* (1986) 181 Cal.App.3d 997, 1019-1020 [involving allegations that husband used community assets to improve his separate business].) We

---

[11]    Dinesh testified that he purchased furniture for his New York apartment for $25,000 in 2010 and the items depreciated in value during the four years they were used.

review the trial court's findings for substantial evidence. (*In re Marriage of Moore* (1980) 28 Cal.3d 366, 375 (*Moore*) [insufficient evidence of deliberate misappropriation].)

We conclude Dixie has not established trial court error. There was insufficient evidence that many of the items on Blumenthal's schedules, like amounts paid to an interior designer, were gifts, or items given without the receipt of valuable consideration in return. (*Moore*, *supra*, 28 Cal.3d at p. 375 [husband's use of community assets to purchase alcohol was not a gift because he received alcoholic beverages in return].) Dinesh worked and enhanced the community estate from New York. The couple enjoyed an upper class standard of living. Dinesh reasonably incurred expenses associated with his life in New York.

Further, we agree with the trial court's assessment that Dixie's claim was lacking in evidentiary support. Her claim was based on Blumenthal's schedule, but there was a missing link between the amounts listed on Blumenthal's schedule and whether they were "gifts" to Girlfriend. The accountant understood from Dinesh's testimony that he had purchased certain items for Girlfriend, but Dinesh mostly could not estimate the insignificant value of those items. Otherwise, Blumenthal listed amounts based on Dixie's speculation that certain line items on their bank account or credit card statements were amounts spent on Girlfriend. For example, his schedule estimated the value of an "engagement ring" at $100,000, based solely on Dixie's unsupported representation. Although Dinesh estimated he had spent "around $50,000" on a ring, the court was not required to accept his testimony on this point as credible. The "Michael C. Fina" line item on Blumenthal's schedule showed an expenditure of only around $15,000.

22

When pressed during trial, Blumenthal admitted he had no evidentiary basis that the amounts on his schedule were spent on Girlfriend or that certain amounts were paid using community funds. He conceded that if Dinesh was living in the New York apartment with Girlfriend while leasing it, then the expenditure was probably not properly characterized as a "misappropriation" from the community. All things considered, the court could reasonably find that Dixie failed to meet her evidentiary burden to establish a claim for reimbursement.

The trial court also expressed fairness concerns with respect to Dixie's claims for reimbursement, particularly when the parties' accountants were unable to confer and reconcile amounts. Blumenthal's misappropriations schedule was introduced on the last day of trial. The trial court remarked earlier in the trial that Dixie had spent significant community funds on her affair, for which Dinesh made a claim for reimbursement against Dixie. Based on these proceedings, the trial court implicitly found it inequitable to charge Dinesh with the cost of an engagement ring when he asserted a substantially or wholly offsetting claim against Dixie for thousands of dollars she spent in pursuing an affair with Boyfriend. Accordingly, the trial court did not err in denying Dixie's reimbursement claim.

VI.   *No Reversible Error in Finding that Two Books were Dinesh's Separate Property*

Dixie contends the court erred in determining that two books, which we refer to as "America" and "Stealing America," were Dinesh's separate property.[12] We find no merit in Dixie's claim.

---

[12]   The books are fully titled, "America:  Imagine a World Without Her" and "Stealing America."

Dinesh testified he conceived the idea of writing America in December 2012 (postseparation) and began writing it in 2013. Contemporaneous emails to his publisher support his testimony. America was published in 2014. Dinesh wrote and published Stealing America after America.

As we have noted, Dinesh was a prolific author of conservative political and religious works. The trial court found he published four books before marriage and confirmed those as his separate property; he published 13 books during or shortly after the marital period and confirmed those as community property; and he published two books (America and Stealing America) after separation, in 2014 and 2015, respectively, and confirmed those as his separate property. Royalties from the community property books were divided equally, while earnings from his separate property books were not.

Dixie argued at trial, as she does now, that America and Stealing America were derivative of earlier community property works and that the books, or an appropriate portion thereof, should be characterized as community property. At trial, she presented a chart showing that his last two books shared language and themes with his earlier writings.

California community property law recognizes that each spouse's effort, time and skill are community assets and any benefit derived therefrom belongs to both. (*In re Marriage of Worth* (1987) 195 Cal.App.3d 768, 773 (*Worth*).) However, the "earnings and accumulations of a spouse . . . *after* the date of separation of the spouses, are the separate property of the spouse." (Fam. Code, § 771, subd. (a), italics added.) "Under California's community property law, the characterization of 'property as separate, community, or quasi-community' 'is an integral part of the division of property on marital dissolution.' [Citation.] Courts recognize several factors relevant to this task

24

[citation], but 'the most basic characterization factor is the time when property is acquired in relation to the parties' marital status' [citation]." (*In re Marriage of Finby* (2013) 222 Cal.App.4th 977, 984.)

"Courts typically apply a substantial evidence standard of review to the court's characterization of property as separate or community." (*In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1472.) Issues pertaining to allocation of a community interest in separate property are reviewed for abuse of discretion. (*Id.* at p. 1473.)

We conclude substantial evidence supports that America and Stealing America were fruits of Dinesh's postseparation labor, that is, he entirely conceived and wrote the books after separation. The books, and earnings therefrom, were thus his separate property. In comparison, the community garnered royalties from 13 books that resulted from Dinesh's efforts during the marital period. The trial court was not required to believe Dixie's evidence, which may have supported an inference that Dinesh conceived some part of his last two books during marriage.

On appeal, Dixie points to flaws in the trial court's reasoning for its separate property characterization, but we are not bound by the trial court's reasoning. (*In re Marriage of Mathews* (2005) 133 Cal.App.4th 624, 632 [appellate court reviews the action of the lower court and not the reasons given for its action].) Certainly, the court acknowledged that each of Husband's books built upon his prior works. Yet the trial court also found that his last two books sold because of "Husband's reputation" (incapable of valuation) and his "post-separation efforts in presenting old ideas in a new light." In other words, Dinesh's last two books resulted from new efforts and labor. Each work generated a new stream of income. We do not perceive an abuse of the court's discretion.

25

Dixie cites *Worth*, *supra*, 195 Cal.App.3d 768, in support of her position that some portion of Dinesh's last two books were community property, but in *Worth*, the "husband conceived, wrote and published the trivia books during the marriage." (*Id*. at p. 773.)  Here, substantial evidence supports that Dinesh conceived, wrote, and published his last two books after separation. Thus, the court did not err in characterizing the books as his separate property.

VII. *No Reversible Error in Denying Dixie's Claim Relating to a Netflix Contract*

Dixie next contends the court erred in not reserving jurisdiction to divide a hypothetical Netflix contract.[13]  Her contention is based on the following facts:  In late October 2012, Mark Joseph (a marketer) exchanged emails with Dinesh regarding Joseph's belief that Lionsgate (the company holding distribution rights over one of Dinesh's films) was failing to exploit a "Netflix contract" worth approximately $4.0 million.  On the last day of trial in 2016, after Dinesh was already unavailable for trial, Dixie's accountant Blumenthal included the "Netflix contract" as a community asset. Blumenthal had no evidence that anyone ever reached a contract with Netflix.

In contrast, Dinesh's accounting expert, Kessler, had learned from Dinesh, Joseph, and Dave Shankwiler (a Lionsgate representative) that a contract to stream Dinesh's film through Netflix had not come to fruition.

---

[13]    Dixie also argues the court should have reserved jurisdiction over postseparation business entities awarded to Dinesh but provides no facts about the entities or pertinent argument why the court should have reserved jurisdiction over them.  "When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary." (*Landry v. Berryessa Union School Dist*. (1995) 39 Cal.App.4th 691, 699-700.)  We deem this issue to be forfeited.

Netflix chose to not license the film. There was no evidence presented by either party's forensic accountant that Dinesh had received an unaccounted-for distribution of $4.0 million.

The trial court found that no contract was ever signed with Netflix and accordingly denied Dixie's claim for reimbursement.

We conclude the trial court did not err in denying Dixie's claim and did not abuse its discretion in declining to reserve jurisdiction on this issue. Substantial evidence supports the court's finding that the community had no claim to future income from a "Netflix contract" because the contract did not exist. *In re Marriage of Munguia* (1983) 146 Cal.App.3d 853, 858-859, cited by Dixie, is inapposite. In *Munguia*, there was no question that a community property business existed—the issue was its valuation, which greatly depended on the contingent event of a lease renewal. In that case, the trial court abused its discretion in not reserving jurisdiction. (*Ibid.* [trial court may not attempt to divide " 'conjectural' " assets, or assets that cannot be accurately valued at the time of trial].) Here, there was no asset that required future valuation. The court did not abuse its discretion in denying Dixie's claim for reimbursement without reserving jurisdiction.

VIII. *No Reversible Error Relating to Dixie's Breach of Fiduciary Duty Claims*

Dixie contends the trial court erred in not imposing sanctions against Dinesh for claimed breaches of fiduciary duty. The breaches consist mostly of alleged failures to disclose certain assets, both before and after separation. Relatedly, Dixie argues that the court's final statement of decision was deficient as to its basis or rationale for denying her request for sanctions. We address Dixie's claims below and conclude the court did not abuse its discretion.

## A. *Guiding Principles*

Family Code section 721[14] (located in a chapter of the code entitled "Relation of Husband and Wife") creates a broad fiduciary relationship between spouses in their transactions with each other. This relationship "imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other." (§ 721, subd. (b).)

Section 1100 (located in a part of the code entitled "Management and Control of Marital Property") delineates rules governing a spouse's management of marital property. It references the section 721 fiduciary relationship and declares it to be operative with respect to the management and control of community property, "until such time as the assets and liabilities have been divided by the parties or by a court." (§ 1100, subd. (e).) Each spouse has an "obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest and debts for which the community is or may be liable, and to provide equal access to all information, records, and books that pertain to the value and character of those assets and debts, upon request." (§ 1100, subd. (e).)

Section 1101, which immediately follows section 1100, sets forth remedies for breach of the fiduciary duty between spouses. Section 1101, subdivision (a) provides that a spouse has a claim for any breach of fiduciary duty against the other spouse that results in impairment of the "undivided

---

14    Further unspecified statutory references are to the Family Code.

28

one-half interest in the community estate . . . ."[15]  Section 1101, subdivision (f) states that a spouse may pursue the legal remedies set forth in the section in a legal dissolution action or independently without filing a dissolution action.  Section 1101, subdivisions (g) and (h) delineate two remedies applicable when a spouse breaches the fiduciary duty by transferring or failing to disclose an asset:  subdivision (g) allows for an award of 50 percent of the value of the asset, and subdivision (h) allows for an award of 100 percent of the value of the asset if the breach falls within the "oppression, fraud, or malice" referenced in Civil Code section 3294.

In addition to the above remedies, the Family Code includes other provisions that allow for sanctions "in contexts outside the management and control of marital property."  (*In re Marriage of Simmons* (2013) 215 Cal.App.4th 584, 591 (*Simmons*).)

Section 2107 (set forth in a division of the code entitled "Nullity, Dissolution, and Legal Separation" and a chapter entitled "Disclosure of Assets and Liabilities") allows for sanctions for the failure to comply with the duty of disclosure set forth in the chapter.  Section 2100, subdivision (c), which precedes section 2107, provides that "a full and accurate disclosure of all assets and liabilities in which one or both parties have or may have an interest must be made in the early stages of a proceeding for dissolution of marriage or legal separation of the parties, regardless of the characterization as community or separate, together with a disclosure of all income and

---

15    Section 1101, subdivision (a) states in full:  "A spouse has a claim against the other spouse for any breach of the fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate, including, but not limited to, a single transaction or a pattern or series of transactions, which transaction or transactions have caused or will cause a detrimental impact to the claimant spouse's undivided one-half interest in the community estate."

29

expenses of the parties." "This disclosure duty is ongoing . . . ." (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1476 (*Feldman*).) To implement the disclosure obligation, the Family Code requires the service of a preliminary and final declaration of disclosure, identifying "all assets and liabilities in which one or both parties may have an interest . . . ." (§ 2103; see also §§ 2104-2105.)

"Section 2107, subdivision (c) requires the trial court to impose monetary sanctions and award reasonable attorney fees if a party fails to comply with any portion of the chapter of the Family Code that deals with a spouse's fiduciary duty of disclosure during dissolution proceedings, i.e., sections 2100 to 2113. The statute provides, 'If a party fails to comply with any provision of this chapter, the court shall, in addition to any other remedy provided by law, impose money sanctions against the noncomplying party. Sanctions shall be in an amount sufficient to deter repetition of the conduct or comparable conduct, and shall include reasonable attorney's fees, costs incurred, or both, *unless the court finds that the noncomplying party acted with substantial justification or that other circumstances make the imposition of the sanction unjust.*' (§ 2107, subd. (c).)" (*Feldman, supra,* 153 Cal.App.4th at p. 1477, italics added.)

Similarly, section 271, subdivision (a) provides trial courts with authority to order the opposing party to pay attorney fees and costs in the nature of a sanction "based on conduct that frustrates the policies of settlement, cost reduction, and cooperative resolution of litigation." (*Simmons, supra,* 215 Cal.App.4th at p. 592.)

In summary, specified remedies under section 1100, for breaches of fiduciary duty that pertain to the management and control of marital property, are available when the alleged breach, mismanagement, and/or

30

nondisclosure "results in impairment to the claimant spouse's present undivided one-half interest in the community estate . . . ." (§ 1101, subd. (a).)

A spouse's breach of fiduciary duty may result in sanctions under other provisions of the Family Code even without a showing of "impairment" resulting from the breach.  Sanctions may be appropriate to effectuate "the goal of reducing the adversarial nature of marital dissolution rather than at redressing any *actual harm* inflicted on the complaining spouse." (*Feldman*, *supra*, 153 Cal.App.4th at p. 1480.)  Nonetheless, the trial court need not impose sanctions if it finds "that the noncomplying party acted with substantial justification or that other circumstances make the imposition of the sanction unjust." (§ 2107, subd. (c).)

Sanctions orders are reviewed for an abuse of discretion.  We review findings of fact that formed the basis for the award of sanctions under a substantial evidence standard of review. (*Corona*, *supra*, 172 Cal.App.4th at pp. 1225-1226 [sanctions order will be overturned only if "no judge could reasonably make the order," considering all of the evidence viewed most favorably in support of the order and indulging all reasonable inferences in its favor]; *Feldman*, *supra*, 153 Cal.App.4th at pp. 1478-1479.)

B.     *Statements of Decision*

Within the final statement of decision on reserved issues dated September 2016, the court addressed certain claimed breaches of fiduciary duty in connection with dividing the couple's assets.  Then, the issue of sanctions (as to previously addressed breaches of fiduciary duty as well as other litigation conduct) was addressed in the court's final statement of decision on attorney fees, costs, and sanctions, dated December 2016.  There, the court first noted that Dinesh was seeking an award of $250,000 in sanctions due to Dixie's unreasonable litigation conduct.  Balanced against

31

Dinesh's claim was Dixie's claim that he "was uncooperative in discovery, failed to disclose and/or hid assets, . . . and generally conducted himself in bad faith."

The court found merit in Dinesh's claim, stating that "the primary causes for the unreasonable cost of this litigation and the obstacles to settlement are the delays and duplicate work caused by [Dixie's] numerous changes of counsel and her [continuous, unfounded] insistence that [Dinesh] had hidden $13.0 million in India."  At the same time, Dinesh had not been as forthcoming as he should have been with respect to his purchase of real estate in India, which initially justified Dixie's suspicious behavior.  However, Dinesh "served a fully documented schedule of assets and debts on January 30, 2013.  After that date, the only significant new information related to updates required by delays [caused by Dixie] in concluding the litigation."

With certain exceptions (e.g., a penalty against Dinesh for failing to disclose the Rancho Esperanza transaction), the court denied Dixie's request for sanctions based on claimed nondisclosures of information, finding the claims either unmeritorious or offset by Dinesh's request for sanctions against her.

On appeal, Dixie argues that the trial court's statement of decision was insufficient to the extent it did not address "subsidiary issues," or specifically address 26 claimed breaches of fiduciary duty (e.g., an alleged failure to disclose a specified bank account), or, otherwise explain in detail how all her claims were "offset" by Dinesh's claims.

"[A] trial court is required to render a statement of decision addressing the factual and legal bases for its decision as to each of the principal controverted issues of the case.  (Code Civ. Proc., § 632.)  A statement of

32

decision need not address all the legal and factual issues raised by the parties. Instead, it need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124-1125.) "The court is required only to state the ultimate rather than evidentiary facts." (*In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1318.)

Based on our review of the court's statements of decisions, we conclude they were adequate. In Dixie's opening trial brief, she listed one of the principal controverted issues in a general fashion, as "breaches of fiduciary duty by Dinesh," and stated that she would demonstrate, at trial, Dinesh's "impermissibly transferring community property, refusing and failing to account for property, . . . refusing and failing to provide Dixie with access to all books and records," and "failing to advise her of relevant investment opportunities." Dixie's closing trial brief listed a few examples of specific alleged breaches and noted that the issues of "attorney's fees and sanctions" had been bifurcated for determination after the property and support issues were adjudicated.

In turn, the court's statements of decisions addressed the "breaches of fiduciary duty" in a commensurate level of detail, sometimes with particularity when discussing particular assets (e.g., when sanctioning Dinesh for not disclosing the Rancho Esperanza investment profit), and more generally when addressing the issue of sanctions. We understand the court's stated basis for declining to impose additional sanctions against Dinesh for claimed nondisclosures of information, namely, that even if he failed to disclose certain assets, he disclosed them by January 30, 2013, and any lapse by Dinesh after that point was "understandable" and offset by Dixie's

33

conduct, including but not limited to, her constantly changing counsel, delays, and duplicative requests.

Indeed, the court wrote rather harshly of Dixie's litigation conduct as follows: "The real problems in exchanging information and delays in this case has been caused by [Dixie] engaging multiple law firms and experts. Her legal team at any given time was not aware of the information previously provided and it was impossible to efficiently manage this case or resolve [Dixie's] shifting claims." Under the circumstances, we conclude the court's statements of decision were sufficient.

## C.     Alleged Breaches of Fiduciary Duty

We briefly address Dixie's specific points regarding Dinesh's allegedly sanctionable conduct and conclude on balance that the court did not abuse its discretion in declining to impose additional sanctions.

### 1.     *Failure to disclose separate bank account No. 4746 and postseparation payments of legal fees and campaign contributions using separate funds*

Dixie claims that Dinesh failed to timely disclose his opening of a separate bank account, No. 4746, in October 2013 (one year after separation). He disclosed the account in November 2014, well before trial. She also argues Dinesh did not disclose (1) his postseparation payments of legal fees relating to a criminal case[16] using funds from separate bank accounts, and (2) making illegal campaign contributions of $20,000, which was the basis for the criminal case.

We perceive no abuse of discretion in the court's decision not to sanction this conduct. The evidence presented by Dixie of Dinesh's claimed

---

[16]     In 2014, Dinesh pleaded guilty to making illegal campaign contributions in 2012. He was fined and sentenced to eight months of nightly confinement in a San Diego facility and several years of probation.

nondisclosures was admitted only for purposes of her state of mind, as to why she was suspicious of him, and not for the truth of the matter of his failing to disclose the assets or payments. Moreover, the court implicitly balanced any defects in Dinesh's disclosure with Dixie's unreasonable litigation conduct to find that sanctions were not needed (or were offset). The court also found that Dinesh's illegal campaign contributions and criminal attorney fees were paid using his separate funds. Given this finding, Dixie did not demonstrate an impairment to the community estate. Dixie argues she was "never told" that Dinesh would be making illegal contributions, which in all likelihood, protected her from criminal charges. The trial court acted within its discretion in declining to impose further penalties.

2.  *Failure to disclose purchase of Rancho Esperanza investment for Daughter*

Dixie contends that Dinesh failed to disclose a deposit of community funds to Daughter's investment account in May 2012 and the subsequent use of funds from that account to purchase an interest in Rancho Esperanza. As discussed in section IV, *ante*, the court implicitly found that the community made a gift of college funds to their minor daughter in May 2012, which is not sanctionable conduct. However, for not disclosing the Rancho Esperanza investment opportunity, the court sanctioned Dinesh the amount of profit the community could have earned under section 1101.

Dixie argues that Dinesh should have been additionally sanctioned for nondisclosure under section 2107. The court found that additional sanctions were not necessary given the circumstances, noting that Dinesh most likely intended to "curry favor" with Daughter rather than flout his duty of disclosure. We conclude the court acted within its discretion in declining to additionally penalize Dinesh.

35

3.    *Failure to disclose monthly income and sources of income*

Dixie claims that Dinesh failed to sufficiently disclose his monthly income in October 2013, based on his statement of current monthly income as $30,000. A jointly retained, court-appointed accounting expert, Tony Yip, conducted a thorough analysis of Dinesh's income, based upon numerous documents he provided, and opined that his approximate monthly income in 2011, 2012, and 2013, was $72,000, $132,000, and $160,000, respectively.[17]

Dinesh's income and expense statement submitted in October 2013 approximated his current "self-employment income" as $30,000 per month. He explained that he was receiving income at the time from two separate sources—film advancements and consulting pay. He specifically stated that these sources were "random" and "sporadic." He listed the latest income he had received from advances and consulting.

We conclude the court did not err in declining to impose sanctions against Dinesh with respect to his income disclosure. There is no substantial evidence to support that he failed to disclose his income, which was highly variable and incapable of determination from one or even several documents, e.g., W-2 forms. An expert was required to estimate his monthly income after performing a forensic analysis of various income sources (royalties, dividends, one-time payments, book advancements, etc.) over time.

Dixie further claims that Dinesh failed to provide Yip with "all material facts and information" in connection with the couple's deposits from 2007 through 2011. However, Yip testified he had been able to trace or verify all of the couple's income sources through his review of the D'Souza's bank records. Some "unexplained" deposits were expense reimbursements, and some

---

17    Yip also provided alternative figures for each year based on different assumptions.

36

records were not available despite attempts to obtain them. Dixie did not establish a sufficient basis for sanctions.

4. *Failure to disclose India transactions/income*

Dixie claims that Dinesh should have been sanctioned for his conduct relating to various community investments or transactions in India, including transfers of funds into bank accounts there, maintaining a "travel account" for purchases in India, investments in properties solely in his name, and not making proper disclosures of income and debts relating to the five Indian properties.

The court found that Dixie's "breach of fiduciary claims against [Dinesh] for failure to disclose are not well founded." The court believed Dinesh's testimony on the subject of "India" and found his conduct to be reasonable and/or justified. Dinesh testified that Dixie knew generally, and did not care to know the details, about their Indian bank accounts. The family traveled together to India, and Dinesh always provided Dixie with Indian currency for her and the family's expenditures. Furthermore, the court found that Dixie knew about his purchase of Indian properties by March 2012 (preseparation). Consistent with his position that the couple was already separated in 2010, Dinesh purchased interests in the Indian properties in his own name. He identified the properties on disclosure statements. Dinesh did not have much information about the properties because they were purchased and managed by his siblings, who lived in India. He was unaware the properties generated rental income until the dissolution proceeding was well underway and the properties were in the process of being appraised, in the last half of 2015 or so.

Ultimately, the community estate was enhanced by the couple's Indian bank accounts and investments. Moreover, Dinesh made adequate

37

disclosures in the context of the couple's marital practices. Under the circumstances, we find no basis to reverse the trial court's decision.

5. *Failure to disclose gifts to Girlfriend*

Dixie claims that Dinesh should have been sanctioned for failing to disclose gifts he purchased for Girlfriend. Based on our discussion of this issue in section V, *ante*, we conclude the court acted within its discretion in not sanctioning Dinesh for conduct that lacked a sufficient evidentiary basis and was arguably offset in full by Dixie's conduct.

6. *Failure to account for personal belongings*

Dixie claims that Dinesh did not fully account for his furnishings and personal possessions, in New York and elsewhere. The court found that the value of Dinesh's miscellaneous belongings was de minimus. Thus, even assuming these items were not properly disclosed, we conclude the court acted within its discretion in declining to sanction Dinesh given the size of the couple's estate.

7. *Failure to obtain consent for sales of community works*

Dixie argues that Dinesh did not obtain her consent to sell community works to (1) Kingdom Film, LLC (Kingdom Film), and (2) America Film, LLC (America Film). Kingdom Film exercised its option to purchase several of Dinesh's works for $200,000 in June 2013, with the intention of making a film based on the books. The only evidence in the record was that these film rights were worth $200,000. Likewise, America Film purchased the film rights to one of Dinesh's books, "What's So Great About America," and another of his books for $100,000 (or presumably $50,000 for each book). Again, the only evidence in the record was that the price received by the

38

community was the "standard price for a documentary film of this budget and magnitude."

Dixie has failed to prove a breach of fiduciary duty under section 1101. Dinesh did not habitually consult with Dixie regarding the details of their financial transactions, which she admittedly did not understand. She was aware he wrote books for a living and that the books could sometimes be made into films. There is no evidence the community suffered an impairment from sales of Dinesh's works to Kingdom Film and America Film. The court did not err in denying sanctions.

8. *Erroneous amounts on disclosure statement*

Dixie faults Dinesh for an erroneous disclosure on several of his disclosure statements. Initially, he disclosed a 50 percent interest in all five Indian properties, including one property known as Art Guild. At trial, however, he testified that he actually held only a one-third interest in the Art Guild property. Dinesh also did not initially disclose any debt associated with the Art Guild property but testified at trial that he believed he still owed about $50,000 to purchase the property. The court accepted Dinesh's testimony as credible and found no intentional breach of fiduciary duty. The court did not abuse its discretion in denying sanctions.

9. *Other breaches*

Dixie refers to other breaches in the record but presents no specific argument about them. Thus, we do not address the "other breaches."

In summary, this case was heavily litigated and gave rise to various claims of sanctionable conduct by both parties. We are persuaded the trial court understood the applicable legal standards, balanced relevant considerations, and acted within its discretion.

39

IX.    *No Reversible Error Relating to Bank Account No. 8157*

Dixie next argues that Dinesh should have been charged with about $413,000, allegedly once contained in one of the couple's joint bank accounts (No. 8157).  Her expert accountant Blumenthal testified he initially valued account No. 8157 at approximately $413,000, prior to reviewing updated bank statements.  However, upon receiving and reviewing the bank statements, Blumenthal admitted at trial that the account was closed with a zero balance in December 2009 and should be removed as a community asset.  Dixie nonetheless maintained that there were unaccounted-for transfers out of the account, made without her knowledge, which should have been charged to Dinesh.

Dinesh's expert accountant, Kessler, testified that account No. 8157 had a $0 value as of the parties' date of separation and was therefore not a community asset to be divided.  First, Kessler traced the funds transferred out of account No. 8157 during marriage to two other joint bank accounts (No. 0543 and No. 6414) and second, account No. 8157 was closed with a $0 balance long before the couple's date of separation.  The trial court did not list account No. 8157 as an asset to be divided.

On appeal, Dixie cites *In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252 (*Margulis*), for the rule that once a nonmanaging spouse makes a prima facie showing concerning the existence and value of a community asset in the control of the other spouse *postseparation*, the burden shifts to the managing spouse to rebut the showing or prove a lesser value of the asset.  In *Margulis*, available evidence showed that the couple's investment accounts likely held more than $1 million in 1996 (at separation) and $1.5 million in 1999 (postseparation).  (*Id.* at p. 1266.)  Yet inexplicably, by the time of trial in 2008, the managing

40

spouse claimed only $20,000 was left in the accounts.  (*Ibid*.)  The court of appeal discussed that the managing spouse had a "duty to account for his *postseparation* management of these assets" (i.e., between 1996 and 2008), and the burden shifted to him to prove a proper disposition of the funds.  (*Id*. at pp. 1266-1267, italics added.)

Dixie's reliance on *Margulis* is misplaced.  The uncontested evidence in this case shows that account No. 8157 was closed during the parties' marriage and no longer held a balance as of the parties' date of separation.  Account No. 8157 was closed well before the parties separated.  Under *Margulis*, Dinesh had no duty to account for transfers between the couple's jointly owned accounts *during* marriage, and there is no hint in the record that transfers out of the couple's other accounts (No. 0543 and No. 6414) were for a non-community purpose.  Dixie has failed to establish trial court error.

X.      *No Reversible Error in Determining Permanent Spousal Support*

Dixie lastly claims the trial court erred in setting her permanent spousal support at $35,000 per month ($420,000 per year).  She specifically argues (1) the court used the parties' marital standard of living improperly "as a cap," and (2) the court did not consider her need for savings.

Permanent spousal support is governed by the statutory scheme set forth in Family Code sections 4300 through 4360.  Family Code section 4330 "authorizes the trial court to order a party to pay spousal support in an amount, and for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances set forth in section 4320."  (*In re Marriage of Nelson* (2006) 139 Cal.App.4th 1546, 1559; *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 302.)  The statutory factors include earning capacity, the supporting spouse's ability to pay; the needs of each

41

spouse based on the marital standard of living; the obligations and assets of each spouse, including separate property; the duration of the marriage; the age and health of the parties; any documented history of domestic violence; tax consequences; balance of hardships; and any other factors pertinent to a just and equitable award. (§ 4320.) "The trial court has broad discretion in balancing the applicable statutory factors and determining the appropriate weight to accord to each, but it may not be arbitrary and must both recognize and apply each applicable factor." (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 207; see also *In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1442-1443.)

In this case, the trial court's final statement of decision explicitly addressed and discussed each of the Family Code factors at length. Based on our review of the record, the court did not use the marital standard of living as a "cap" or ceiling, but correctly as a "point of reference." (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 485.) The court described the parties' marital standard of living as "upper class . . . which included expensive cars, world travel and substantial savings and investments." The court found the couple's average income from 2007 through 2012 was about $75,000 per month and that the couple's expenses never exceeded their monthly income, which the court used to assess and find that Dixie was "exaggerating" her monthly needs at almost $142,000. The court observed that she had no housing payment and had comfortably supported herself with $25,000 per month (or $300,000 per year) over many months of litigation.

The court's award to Dixie also allowed for personal savings. During marriage, the community incurred expenses relating to Daughter, saved money for her college education, and were required to pay their home mortgage and other debt. Postseparation, those expenses and allocations

42

would not be incurred or needed. The court's final statement of decision found the couple was "essentially debt free," Dixie had no mortgage expense, and Dinesh was the one providing any financial assistance to Daughter while she was in college. The court also found that Dixie was able to engage in gainful employment. Dixie has not demonstrated an abuse of the court's discretion.[18]

## DISPOSITION

The judgments are affirmed. Costs on appeal are awarded to Dinesh.

HUFFMAN, J.

I CONCUR:

BENKE, Acting P. J.

---

[18] Given our resolution of Dixie's appeal, we need not address the issues raised in Dinesh's protective cross-appeal.

IRION, J., dissenting and concurring.

"A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 (*Arceneaux*).) In a court trial, application of this fundamental principle triggers the doctrine of implied findings: Because "the reviewing court presumes that the trial court made all factual findings necessary to support the judgment" for which there is substantial evidence (*In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 293; see *In re Marriage of Sahafzadeh-Taeb & Taeb* (2019) 39 Cal.App.5th 124, 145 ["we must presume in favor of the trial court's order ' "every finding of fact necessary to support it" ' "]), all necessary findings of "ultimate facts" will be implied and the only issue on appeal is whether the implied findings are supported by substantial evidence (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792-793, superseded by statute on other grounds; *Arceneaux*, at p. 1135, quoting *In re Marriage of Dawley* (1976) 17 Cal.3d 342, 354).

When a proper request for a statement of decision has been made, however, the foregoing scope of appellate review may be affected. Under Code of Civil Procedure section 632, upon a party's timely request, the court must issue a statement of decision "explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial." Correspondingly, under Code of Civil Procedure section 634, if the tentative or proposed statement of decision does not resolve a controverted issue or is ambiguous, and the omission or ambiguity was properly brought to the attention of the trial court, then "it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." (See *Arceneaux*, *supra*, 51 Cal.3d at pp. 1133-1134.)

In the present case, in conjunction with the bifurcated trial on attorney fees, costs, and sanctions, Dixie D'Souza[1] requested a "Statement of Decision and Calculation (Code of Civil Procedure section 632)."[2] At the conclusion of

---

[1] Consistent with the majority opinion, for clarity I will refer to the parties by their first names.

[2] On appeal, Dixie frequently relies on the *inapplicability* of the doctrine of implied findings, arguing that the family court erred in failing to make specific findings in response to her objections to the court's two tentative statements of decisions. However, the issuance of a properly requested statement of decision will avoid an application of the doctrine of implied findings in a nonjury trial *only if* "both steps of the two-step procedure under [Code of Civil Procedure] section[s] 632 and 634" are followed. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 983 (*Thompson*).)

Here, the record contains what appear to be Dixie's timely objections to the family court's tentative statements of decisions in phases two (trial on reserved issues) and three (trial on attorney fees, costs, and sanctions) as required by Code of Civil Procedure section 634; and Dixie's objections appear to set forth the issues and arguments which she presents on appeal. However, Dixie has not directed us to *any* Code of Civil Procedure section 632 request for a statement of decision, and "[t]he second step is not a substitute for the first. Objections [under section 634] are germane only as to issues framed as materially controverted under section 632." (*Thompson, supra*, 6 Cal.App.5th at p. 982.) "[S]trict adherence to both steps of the process is necessary before we will reverse the presumption of correctness generally accorded trial court judgments on appeal." (*Id.* at p. 983.)

"[T]he burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.) Here, Dixie does not mention, let alone provide a record reference for, a request for a statement of decision from either of the trials at issue in her appeal. On this basis alone, the doctrine of implied findings should apply. (*Thompson, supra*, 6 Cal.App.5th at p. 983.) Nonetheless, an independent review of the 7,451-page record discloses that, in her phase three trial brief (attorney fees, costs, and sanctions), Dixie presented what appears to be a timely request for a statement of decision *for this phase* of the

2

the trial, the family court issued a tentative statement of decision (TSOD). Dixie timely filed objections to the TSOD. Without making any changes to the TSOD, the court filed a final statement of decision on fees, costs, and sanctions (FSOD). Accordingly, the doctrine of implied findings is inapplicable to our review of any controverted issue for which Dixie *both* requested a statement of decision *and* objected to the TSOD. (See *Arceneaux*, *supra*, 51 Cal.3d at pp. 1133-1134; *Thompson*, *supra*, 6 Cal.App.5th at p. 983.)

Despite the inapplicability of the doctrine of implied findings (to those issues for which Dixie requested a statement of decision and timely objected), the majority (1) concludes that both final statements of decision are "adequate" for purposes of Code of Civil Procedure section 632 (maj. opn., *ante*, at p. 33), yet (2) on more than one occasion further concludes that there is no error *based on inferences* or what the majority deems to be findings "*implicitly*" made by the family court (e.g., maj. opn., *ante*, at pp. 23, 35, italics added).

For example and without limitation, I am most troubled by the majority's ruling that the family court's denial of Family Code section 2107, subdivision (c) (§ 2107(c)) sanctions regarding the Rancho Esperanza investment is supported by the record on appeal. (Maj. opn., *ante*, pt. VIII.C.2.) The trial court ruled that Dinesh breached his fiduciary duty to Dixie both by not offering the investment opportunity to the community and by not disclosing to Dixie the purchase of the investment (with community funds) for the parties' daughter. Indeed, as a remedy for this breach of fiduciary duty, the court charged Dinesh with the entire profit ($123,390 on

_____

trial proceedings. The independent review did not disclose a similar request during the phase two proceedings.

an investment of approximately $150,000) under Family Code section 1101. (Maj. opn., *ante*, at p. 35.)

Section 2107(c) provides in full:

> "If a party fails to comply with any provision of this chapter [(Fam. Code, § 2100 et seq.)], the court *shall*, in addition to any other remedy provided by law, impose money sanctions against the noncomplying party. Sanctions shall be in an amount sufficient to deter repetition of the conduct or comparable conduct, and shall include reasonable attorney's fees, costs incurred, or both, *unless the court finds that the noncomplying party acted with substantial justification or that other circumstances make the imposition of the sanction unjust.*" (Italics added.)

Sanctions under section 2107(c) are *in addition to* other remedies available for a breach of fiduciary duty. (*In re Marriage of Schleich* (2017) 8 Cal.App.5th 267, 295-296 [violations that cannot support an award of attorney fees under Fam. Code, § 1101, subd. (g) [remedies for breach of fiduciary duty] "are independently sanctionable under [Family Code] section 2107"].) More to the point, sanctions under section 2107(c) are *mandatory* " 'unless the court finds that the noncomplying party acted with substantial justification or that other circumstances make the imposition of the sanction unjust.' " (*Schleich*, at p. 296, quoting § 2107(c); see *In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1477.)

Here, the family court found that Dinesh had breached his fiduciary duty to Dixie, charged Dinesh with the profit the community would have received had he offered the investment to the community, yet denied section 2107(c) sanctions. (Maj. opn., *ante*, at p. 35.) In affirming this ruling, the majority concludes that the family court "found that additional sanctions were not necessary *given the circumstances*," since "Dinesh most likely intended to 'curry favor' with Daughter rather than flout his duty of

4

disclosure." (*Ibid*., italics added.)  Although "other *circumstances* [that] make the imposition of the [section 2107(c)] sanction unjust" is a valid basis on which to deny section 2107(c) sanctions, the family court made no finding of such "other circumstances" here in its FSOD.  Moreover, the above-quoted finding cannot support an exception to section 2107(c)'s mandatory directive, since the family court issued that finding during the phase two proceedings (in which the court found that Dinesh breached his fiduciary duty), not in connection with the phase three proceedings, where the court was *required* to issue the sanctions "unless the court finds that the noncomplying party acted with substantial justification or that other circumstances make the imposition of the sanction unjust."  In short, the majority improperly infers that, in denying section 2107(c) sanctions, the family court intended to rely on a finding made in earlier proceedings on a breach of fiduciary duty.

In my disagreement with the majority's analysis, I am *not* saying that the trial court would not have made such a finding had it responded to Dixie's objection.  Nor am I expressing an opinion (either way) whether such a finding qualifies as "other circumstances" for purposes of avoiding the mandatory language in section 2107(c).  I am merely detailing *one* example of the majority *inferring findings* that the family court did not expressly make on a controverted issue that Dixie included both in her request for a statement of decision and in her objections to the TSOD.

For the foregoing reasons, I respectfully dissent from any ruling in the majority opinion on any controverted issue in which (1) Dixie requested a statement of decision, (2) Dixie objected to the family court's proposed findings in a tentative statement of decision, and (3) the majority infers that the family court made (or the majority rules that the family court "implicitly"

5

made) a finding necessary to the court's ruling. As to all other issues in the majority opinion, I concur in the results.

IRION, J.